IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TOURI EUGENE ABBOTT and | ) | |
| PHILLIP'S AUTO RECYCLING & | ) | |
| SALVAGE, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:20-CV-776-WKW |
| | ) | [WO] |
| MEGA TRUCKING, LLC, | ) | |
| PATRICE LUMUMBA MORGAN, | ) | |
| and MUL-TY VIBES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This lawsuit arises out of a collision between two tractor-trailers. On August 24, 2020, Patrice Lumumba Morgan (Morgan) was operating a tractor-trailer during the scope of his work for Mega Trucking, LLC (Mega). Traveling south on a U.S. highway in Pike County, Alabama, Mr. Morgan turned left across the northbound lanes of travel, and a northbound tractor-trailer, operated by Touri Abbott (Abbott), crashed into Mr. Morgan's trailer.

Alleging that Mr. Morgan did not yield the right of way to Mr. Abbott and seeking recovery for personal injuries and property damage, Mr. Abbott and the owner of his tractor-trailer (Phillip's Auto Recycling & Salvage, Inc.) sued Mr.

Morgan and the owners of his tractor-trailer (Mega and Mul-Ty Vibes, Inc.) under multiple theories of negligence and wantonness.

Before the court are Defendants' *Daubert* motions to exclude certain parts of the testimony from Plaintiffs' three experts. (Docs # 57, 58, 62.) The expert testimony comes from the investigating officer on the scene of the collision, a transportation safety expert, and an accident reconstructionist. Plaintiffs filed briefs opposing the motions (Docs. # 68, 69, 70), and Defendants replied. (Docs. # 80, 82, 83.) For the reasons discussed below, Defendants' motion will be granted in part and denied in part.

## I.  STANDARD OF REVIEW

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (and its progeny). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts
of the case.

Fed. R. Evid. 702.

Rule 702 assigns the trial court a gatekeeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) ("[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony rests both on a reliable foundation and is relevant to the task at hand.'" (quoting *Daubert*, 509 U.S. at 597)). This gatekeeping responsibility is the same when the trial court is considering the admissibility of "testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co.*, 526 U.S. at 141 (quoting Fed. R. Evid. 702).

Considering *Daubert*'s "gatekeeping requirement," the Eleventh Circuit requires district courts to engage in a "rigorous three-part inquiry" for assessing the admissibility of expert testimony under Rule 702:

> Trial courts must consider whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).

These requirements are known as the "qualification, reliability, and helpfulness"

prongs. *See id.*

      "The burden of establishing qualification, reliability, and helpfulness rests on

the proponent of the expert opinion." *Id.* And the proponent must meet its burden

"by a preponderance of the evidence." *Boca Raton Cmty. Hosp., Inc. v. Tenet Health

Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009); *see also Allison v. McGhan Med.

Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) ("The burden of laying the proper

foundation for the admission of expert testimony is on the party offering the expert,

and the admissibility must be shown by a preponderance of the evidence." (citing

*Daubert*, 509 U.S. at 592 n.10)).

## II.  DISCUSSION

### A.     <u>Alabama State Trooper Michael Wallace</u>

      Defendants move to exclude certain opinions by Alabama State Trooper

Michael Wallace, who responded to the scene after the accident, investigated the

accident, and prepared the crash report.  As to the scope of Defendants' *Daubert*

motion,  Defendants do not dispute that Trooper Wallace is qualified to testify about

his investigation of the accident.  (*See* Doc. # 58 at 7–8; Doc. # 83 at 2 ("Defendants

do not dispute that Wallace is qualified to testify concerning his investigation of the

accident.").)  This would encompass facts within Trooper Wallace's knowledge—

including his observations of the crash scene, the measurements he took, any photographs or videos he took, and his interviews of the drivers (Abbott and Morgan) and eyewitnesses at the scene.  (*See generally* Doc. # 58 at 7.)

However, Defendants contend that Trooper Wallace is not qualified to render opinions on the cause of the collision (which he says was Mr. Morgan's failure to yield the right of way), relatedly which party was at fault, whether Mr. Abbott's vehicle was an "immediate hazard," his belief that the accident could have been avoided if Mr. Morgan had not made the left turn, and that Mr. Morgan made an improper left turn.  Defendants argue that Trooper Wallace is unqualified to talk about these topics because he does not have specialized training in accident reconstruction and because he admits that he does not consider himself an accident reconstructionist.  (Doc. # 58 at 7–9.)  Defendants also argue that Trooper Wallace's opinions on causation and fault are not reliable because they are not based on tested principles or methodology.  (Doc. # 58 at 9–11.)

Plaintiffs counter that based on Trooper Wallace's training and experience in investigating crash scenes, he is qualified to opine on the foregoing causation and fault issues.  The opinions are reliable, according to Plaintiffs, because they are based on Trooper Wallace's interviews of the parties to the crash, his observations of the physical evidence on the scene, and his review of Mr. Morgan's dash cam of the crash.  Finally, they contend that Trooper Wallace's opinions are helpful because he

5

was the primary investigating officer on the scene and because his job required him to determine fault and whether any rules of the road were violated.  (Doc. # 69 at 5–9.)

For the reasons to follow, Trooper Wallace's experience and training as an accident investigator qualify him to render expert opinions on causation and fault, but his opinions are not reliable or helpful.  The *Daubert* motion therefore will be granted.

First, Trooper Wallace is qualified as an accident investigator to offer opinions on causation and fault.  The thrust of Defendants' argument is that Trooper Wallace cannot opine on causation or fault because he is not qualified an accident reconstructionist.[1]   However, Plaintiffs present Trooper Wallace as an accident investigator, not an accident reconstructionist, and Trooper Wallace admits that he

---

[1] The two fields are very different.  As one court has explained:

> Experts in accident reconstruction typically have a degree in engineering, as well as certification in accident reconstruction, and experience conducting studies and experiments, taking measurements, and collecting data from accident scenes, including examining tires and mechanical parts."  They often visit the scene of the accident to recreate the collision.  In contrast, accident investigators respond to the scene, examine evidence, take witness statements, make preliminary determinations as to the cause of the accident, and write initial reports. As such, accident reconstruction and investigation are distinct areas of specialized expertise.

*Monarez v. Torres*, No. EP-19-CV-188-KC, 2020 WL 13419978, at *2 (W.D. Tex. Nov. 2, 2020) (internal citations omitted); *see also Puga v. RCX Sols., Inc.*, 922 F.3d 285, 295 n.7 (5th Cir. 2019) (accord).

is not qualified in accident reconstruction.  (Doc. # 58-1 at 35–36.[2])  Plaintiffs contend that Trooper Wallace's training and experience in accident investigation qualify him to offer opinions on causation resulting from his observations and investigation at the scene.  (Doc. # 69 at 5–6.)

The parties cite no binding authority discussing whether an accident investigator (as opposed to an accident reconstructionist) can give expert testimony on the cause of the accident.  However, several courts have "concluded that experienced accident investigators at the scene of an accident are qualified to testify regarding their investigation and the conclusions flowing therefrom."  *Stevens Transp., Inc. v. Global Transp., LLC*, No. 6:15-CV-552-MHS, 2016 WL 9244669, at *3–4 (E.D. Tex. May 24, 2016) (finding that an officer trained in accident investigation with fifteen years' experience could testify as to the contributing causes of the accident); *see also Gladhill v. Gen. Motors Corp.*, 743 F.2d 1049, 1052 (4th Cir. 1984) (holding that a police officer called to an accident scene could give expert testimony about the cause of the accident based on his 500 or 600 previous accident investigations); *Monarez v. Torres*, No. EP-19-CV-188-KC, 2020 WL 13419978, at *3 (W.D. Tex. Nov. 2, 2020) ("Defendant's insistence on casting Trooper Saldana as unable to perform accident reconstruction misses the point

---

[2] Where a deposition is cited, the cited pages refer to the deposition pages.  Record citations otherwise use the pagination listed in CM/ECF.

entirely—Trooper Saldana is a qualified accident investigation expert," who could testify about "his investigation of the accident and conclusions flowing therefrom including causation."); *Koenig v. Beekmans*, No. 5:15-CV-822, 2018 WL 358307, at *4 (W.D. Tex. Jan. 9, 2018) ("Some district courts in this circuit have permitted officers to provide an opinion on causation even where the officer is not qualified as an accident reconstructionist, provided the officer is qualified through training or experience as an accident investigator." (collecting cases)); *Cartwright v. Am. Honda Motor Co.*, No. 9:09-CV-205, 2011 WL 3648565, at * 4 (E.D. Tex. Aug. 15, 2011) (finding that an officer with fifteen years' experience was qualified to testify as to the cause of the accident); *Main v. Eichorn*, No. W-10-CV-158, 2011 WL 11027844, at *5–6 (W.D. Tex. Mar. 10, 2011) (holding that a police officer with four years' experience in accident investigations was qualified as an accident investigation expert to opine on the minimum vehicle speed, point of impact, and "contributing factors to the collision"); *Vigil v. Michelin N. Am., Inc.*, No. EP-05-CV-001-KC, 2007 WL 2778233, at *4 (W.D. Tex. Aug. 23, 2007) (finding that a deputy sheriff who had investigated 200 traffic accidents was qualified to provide expert testimony "regarding the accident scene, the cause of the accident, and other factors that came to light during his investigation of the accident scene").

Based on these authorities, Trooper Wallace need not be an accident reconstructionist to opine on causation as an accident investigator. So, the next

8

question is whether Trooper Wallace is qualified as an accident investigator to offer an opinion on causation or fault. At the time of the crash, he had been a state trooper since 2017, had investigated over 100 motor vehicle crash scenes, had been trained on basic crash investigation, and had taken an 80-hour traffic homicide investigation course. (Doc. # 69-1 at 10, 12, 14, 34.) Based upon his coursework and field experience, Plaintiffs have shown that Trooper Wallace has the requisite skill to make observations and testify as to the cause of an accident and fault, and any deficiencies in his skills or experience is fodder for cross-examination. *See Daubert*, 509 U.S. at 595 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). But that does not end the inquiry.

While Trooper Wallace's experience is sufficient, Plaintiffs have not shown that Trooper Wallace's method for forming his opinions on causation and fault is reliable. (*See* Doc. # 58 at 7–8 (citing *Hamlett v. Carroll Fulmer Logistics Corp.*, 176 F. Supp. 3d 1360 (S.D. Ga. 2016) (excluding the police officer's opinion on accident reconstruction because the evidence showed that the officer's opinions were speculative and not based upon any reliable methodology)).) The focus on reliability "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

9

Trooper Wallace provides inadequate testimony that he formed his opinions based on enough data or that he used reliable principles.  Defendants point to the following testimony from Trooper Wallace:

> Q.  Is it your belief in this case that Mr. Abbott's vehicle constituted an immediate hazard to Mr. Morgan?
> A.  Yes.  And it was obvious by watching the video as well.
> Q.  So you're basing that off you [sic] watching the video?
> A.  No.  I hadn't seen that [unedited[3]] video until today.
> Q.  All right.  How fast was Mr. Abbott traveling? . . .
> A.  I don't have the means to articulate that.
> Q.  How far away was [Abbott] . . . [w]hen he first saw Mr. Morgan turning[?] . . .
> A.  I don't have anything to measure that with.
> Q.  Well, wouldn't those factors be important in considering whether his vehicle constituted an immediate hazard?
> A.  Yeah, that would be important.
> Q.  Okay.  You don't know what any of those numbers or time, distances or any of those things are: is that correct?
> A.  I do not.

(Doc. # 58-1 at 44–45.)  Trooper Wallace's testimony continued:

> A.  And it's obvious that [Morgan's entering the intersection] did constitute a hazard.
> Q.  And that's obvious based on the fact that a crash occurred?
> A.  Yeah.
> Q.  And the skid marks into the intersection?
> A.  Is what I had documented, if I'm correct, that the gouge marks and the marking at the intersection would have been caused by the crash, not necessarily from the braking.  And I do not have all the pictures and evidence to go back and look at.  It's been almost two years since this crash.

---

[3] Trooper Wallace testified that the first time he viewed the longer version of the dash cam footage was at his deposition on August 9, 2022.  (Doc. # 58-1 at 46.)  Previously, in forming his opinions, Trooper Wallace watched a "shortened" version that "left out the part showing oncoming traffic."  (Doc. # 58-1 at 59–60.)

Q.  But you're unaware of at what point Mr. Abbott began braking?

A.  That's correct.  I was not in the truck.

. . .

Q.  Can you show me where the measurements are shown in the crash report?

A.  The only measurement I have is the width of the highway right there, listed on here.

Q.  Okay.  There's no measurements listed for the length of any skid marks that were observed?

A.  No.

Q.  No measurements on the crash report for the length of any gouge marks that may have been observed?

A.  No.

Q.  There's no indication on this diagram of where in the intersection skid marks may or may not have been observed?

A.  I took photographs of them.

Q.  Did you make any notes about . . . how far in advance of the intersection you first observed the brake—evidence of braking, skid marks, anything like that?

A.  No.

(Doc. # 58-1 at 58–59; Doc. # 58-1, at 54; Doc. # 58 at 4; Doc. # 83 at 4–5.)

Trooper Wallace's methods for opining on causation and fault are not reliable. What stands out is what he does not know.  Trooper Wallace testified that he does not know how fast Mr. Abbott was traveling.  He does not know the distance between Mr. Morgan's tractor-trailer and Mr. Abbott's tractor-trailer when Mr. Morgan turned, and he did not measure the distances at the scene.  He does not know at what point Mr. Abbott used his brakes.  And he took no notes on measurements of any marks on the roadway or their distance from the intersection where Mr. Morgan turned left (or noted if there were no marks).  While Trooper Wallace does opine that the gouge marks and other markings at the scene were caused by the impact of

the tractor-trailers, and not by braking, he does not explain how he reached this conclusion. There is no data, testing, or facts to support his opinions on fault and causation, and he fails to explain how his experience leads him to the conclusion he makes. The analytical gap between the facts and opinions is too wide to find Trooper Wallace's opinions reliable. *See generally Hamlett*, 176 F. Supp. 2d at 1367 (identifying "useful *Daubert* questions" to evaluate the reliability of an expert's opinions (internal citations omitted).)

Plaintiffs have not closed the evidentiary gap. They argue that Trooper Wallace's opinions are reliable because they are "based on information gathered at the scene." (Doc. # 69 at 6.) Plaintiffs cite no page of Trooper Wallace's deposition that discusses Trooper Wallace's methods for why the information gathered at the scene led to the conclusions he reached. Instead, they refer to the deposition "generally." (Doc. # 69 at 6 ("See generally, Depo of Michael Wallace").) It is not the role of the court to scour the deposition testimony to find testimony that supports Plaintiffs' position; however, independent review of Trooper Wallace's deposition reveals that his opinions are not grounded on any reliable technique, theory, or method. Rather, the foundation of Trooper Wallace's opinion appears to be that because Mr. Abbott had the right-of-way, the accident had to be Mr. Morgan's fault. (Doc. # 58-1 at 64.) A jury very well might make that finding, but Plaintiffs have not shown that Trooper Wallace's opinions are based on a reliable method.

Accordingly, Defendants' *Daubert* motion to exclude Trooper Wallace's opinions on fault and causation will be granted. In addition, it follows that Trooper Wallace's testimony on fault and causation would not be helpful. *See United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004) (Expert testimony is helpful "if it concerns matters that are beyond the understanding of the average lay person."). Defendants' motion to exclude testimony by Trooper Wallace on causation and fault will be granted.

## B.    Roger Allen

Plaintiffs have designated Roger Allen as a transportation safety expert "to opine as to whether the actions of Mega . . . with respect to the collision . . . departed from the standard of care required of trucking operators and with the regulations set forth in the Federal Motor Carrier Safety Regulations." (Doc. # 68 at 1–2.)

Defendants' arguments focus primarily on the reliability and helpfulness prongs of the *Daubert* analysis.[4] Defendants argue that Mr. Allen's opinions do not meet *Daubert*'s standards in the following six areas. Plaintiffs oppose Defendants' arguments.

---

[4] To the extent that Defendants dispute Mr. Allen's qualification, the court agrees with the general consensus among courts that Mr. Allen is "an expert in commercial trucking safety standards and practice . . . ." *Van Winkle v. Rogers*, No. 6:19-CV-1264, 2022 WL 4127440, at *2 (W.D. La. Sept. 9, 2022) (collecting cases); *Brown v. M & N Eaves*, No. 4:21-CV-959-KPJ, 2022 WL 17812441, at *3 (E.D. Tex. Dec. 19, 2022) (finding that "Allen is qualified to offer expert opinions under Rule 702 with respect to the applicable safety regulations, including the FMCSR").

## 1.   *Legal Conclusions*

Defendants argue that Mr. Allen's opinions that Mega or Mr. Morgan was negligent, grossly negligent, or wanton are inadmissible legal conclusions.[5] Defendants list six examples.  (*See* Doc. # 57-1 at 7–8; *see, e.g.*, Doc. # 57 at 7 (reciting Allen's opinion that "Mega has shown a blatant and reckless disregard for the safety of the general public and its drivers by not properly qualifying [its] driver, Defendant Morgan." (citing Doc. # 57-1 at 18)).)  Plaintiffs' response does not rebut this argument.

As the Eleventh Circuit has explained, "courts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law."  *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1129 (11th Cir. 2018) (citation and internal quotation marks omitted); *see also Plott v. NCL Am., LLC*, 786 F. App'x 199, 203–04 (11th Cir. 2019) (holding that the district court correctly ruled in a negligence action that the expert "could not testify that it was 'unreasonable' for [the defendant cruise ship] not to provide floor mats outside the . . . doors and not to provide warning signs" because "those opinions constitute[d] legal conclusions, which [were] not a proper topic of expert testimony"); *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537,

---

[5] Mr. Allen's opinions focus on Mega, and not Mul-Ty.  Defendants argue that the arguments against the admissibility of Mr. Allen's testimony apply equally to Mul-Ty.

1541 (11th Cir. 1990) ("A witness . . . may not testify to the legal implications of conduct; the court must be the jury's only source of law.").  Based on this clear authority, Mr. Allen cannot offer opinions that are tantamount to legal conclusions. These include Mr. Allen's opinions cited in Defendants' brief because the opinions do no more than instruct the jury on the result it should reach based upon Mega or Mr. Morgan's conduct.[6]  (Doc. # 57 at 7–8.)  Mr. Allen will be precluded from testifying to legal conclusions.

---

[6] Defendants' brief recites the following legal conclusions by Mr. Allen:

(1) "Mega at that time of this occurrence caused an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and of which Mega had actual, subjective awareness of the risk involved, yet nevertheless acted with reckless indifference to the rights, safety, and welfare of others."  (Ex. A at p. 17.)

(2) "Mega has shown a blatant and reckless disregard for the safety of the general public and its drivers by not properly qualifying their driver, Defendant Morgan."  (*Id.* at p. 18.)

(3) "Mega's conscious disregard for the FMCSR and industry minimum safe operations standards is not only careless and reckless but shows a wanton disregard for the safety of the general motoring public. In my opinion, the pattern and course of conduct was not only negligent, but grossly negligent."  (*Id.* at p. 19.)

(4) "In this case, Mega has an affirmative duty to demonstrate that Defendant Morgan was qualified, but it has failed to do so. In my opinion, the pattern and course of conduct was not only negligent, but grossly negligent."  (*Id.* at p. 20.)

(5) "It is my opinion that the actions and inactions of Defendant Morgan and Mega, based on my knowledge, training, and the federal motor carrier safety regulations, reached the level of gross negligence and reckless disregard for the safety and well-being of the numerous people who were merely other motorists on the roadways."  (*Id.*)

(Doc. # 57 at 7–8.)

**2.    *Violations of the Federal Motor Carrier Safety Regulations***

Defendants argue that Mr. Allen's opinions that Mega violated the Federal Motor Carrier Safety Regulations (FMCSRs) are impermissible questions of law that invade the role of the court.  Defendants cite Mr. Allen's conclusions that Mega violated 49 C.F.R. §§ 376.12, 390.5, 391.11(b)(3), 391.23, and 392.14.  (Doc. # 57 at 5–6; Doc. # 57-1 at 17.)  Plaintiffs respond that Mr. Allen's opinions are "factual issue[s]" about whether Mega's conduct complied with the FMCSRs.  (Doc. # 68 at 8; *see also* Doc # 68 at 10 (arguing that Allen's testimony related to Mega's "factual noncompliance with the FMCSR").)

There is a persuasive consensus among district courts that the meaning of a federal regulation and whether a party has violated that regulation are questions of law for the court.  *See Van Winkle v. Rogers*, No. 6:19-CV-1264, 2022 WL 4231013, at *4 (W.D. La. Sept. 13, 2022) ("Expert testimony regarding the *meaning* and *applicability* of the FMCSRs to the Defendants and whether Defendants complied with these regulations is inadmissible."); *see id.* ("The meaning of federal regulations is not a question of fact, to be resolved by the jury after a battle of experts. It is a question of law, to be resolved by the court." (internal footnotes omitted)); *Brannon v. Swift Transp. Co. of Ariz., LLC*, No. 2:20-CV-623-ECM, 2021 WL 5989145, at *5 (M.D. Ala. Dec. 17, 2021) (precluding an expert from testifying that the tractor-trailer driver violated a FMCSR because the testimony improperly opined

on the "legal implications of [the defendant's] conduct"); *Stiefel v. Malone*, No. 4:18-CV-1540-SGC, 2021 WL 426217, at *11 (N.D. Ala. Feb. 8, 2021) ("[A]n expert witness may not testify as to what one or more of the FMCSRs mean or that a defendant's conduct violated any of those standards because the meaning of a federal regulation is a question of law for the court."); *Trinidad v. Moore*, No. 2:15-CV-323-WHA, 2016 WL 5239866, at *5 (M.D. Ala. Sept. 20, 2016) (precluding an expert from offering testimony that suggested a violation of the FMCSRs because "expert witnesses may not testify that a party violated a federal regulation"). For example, in *Van Winkle*, the district court precluded Mr. Allen from opining that the defendant had to adhere to certain FMCSRs and that the defendant had violated those FMCSRs. 2022 WL 4231013, at *4. The court concluded that eleven of Mr. Allen's opinions fell into the latter categories and were inadmissible legal conclusions. *Id.*

Based on the foregoing authority, all Mr. Allen's opinions on page 16 of his report under the heading "FMCSR Violations by Mega and Defendant Morgan" (Doc. # 57-1 at 17) are inadmissible. His opinions are phrased in broad terms that Mega and Mr. Morgan violated eight FMCSRs because they "ignored" them. (Doc. # 57-1 at 17.) Because the opinions are solely that Mega and Mr. Morgan violated the specified FMCSRs, the opinions are inadmissible legal conclusions. Mr. Allen will be precluded from giving legal opinions about the meaning of the FMCSRs and whether Defendants complied with their obligations under the FMCSRs.

This finding does not mean that Mr. Allen cannot opine at all about the FMCSRs. Experts may offer testimony that "embraces an ultimate issue" under Rule 704(a) of the Federal Rules of Evidence. Admittedly, "[t]he task of distinguishing expert testimony regarding an ultimate issue of fact from expert testimony that offers a legal conclusion 'is not a facile one.'" *Stiefel*, 2021 WL 426217, at *8 (quoting *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983)[7]); *see also Haney v. Mizell*, 744 F.2d 1467, 1473 (11th Cir. 1984) (noting courts "often struggle in attempting to characterize challenged testimony as either admissible factual opinions or inadmissible legal conclusions" and that "[t]he distinction . . . is not always easy to perceive"). As the Third Circuit has explained, "the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony

---

[7] The court in *Owen* cited the example provided in the Advisory Committee Notes to Rule 704:

> The question "Did T have capacity to make a will?" should be excluded. The question "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" is permissible. The first question is phrased in such broad terms that it could as readily elicit a legal as well as a fact based response. A direct response, whether it be negative or affirmative, would supply the jury with no information other than the expert's view of how its verdict should read. Moreover, allowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant.

698 F.2d at 240. This example illustrates that, "under Rule 704, an expert may not make a conclusory statement on a party's capacity, but may provide testimony that touches the underlying issues relevant to a determination of capacity." *Krys v. Aaron*, 112 F. Supp. 3d 181, 193 (D.N.J. 2015).

concerns a party's compliance with customs and practices that implicate legal duties." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 218 (3d Cir. 2006).

Two judges of this court have permitted a trucking safety expert to rely on "federal regulations as a basis for opining on the standard of care in [the] industry." *Trinidad*, 2016 WL 5239866, at *5 (citing *Lohr v. Zehner*, No. 2:12-CV-533-MHT, 2014 WL 2832192, at *3 (M.D. Ala. June 23, 2014)).  In *Trinidad*, which was a negligence action invoking standards of care in the commercial trucking industry, the court explained that expert witnesses "may draw inferences from the facts of a case," but that "they may not draw legal conclusions from those facts."  *Id.* at *4. "To understand where admissible expert opinion in the form of a factual inference crosses the line to inadmissible legal conclusion, courts look to see if the jury is capable of drawing the conclusion itself or if technical assistance is needed."  *Id.* at *5 (citation omitted).

In *Trinidad*, the court explained that "[e]xpert testimony is particularly useful . . . to help the jury understand the standard of care for the tractor-trailer industry." *Id.* at *6.  In addition, "because any determination about what an ordinary tractor-trailer driver would do under certain circumstances to conform to those standards depends upon the factual circumstances involved, it is important to allow experts . . . to apply their experience in the particular industry to different factual scenarios and opine as to whether those scenarios would deviate from that standard of care."  *Id.*

The court concluded that the expert could opine as to whether the driver's "behavior fell below the standard of care for the commercial trucking industry under various sets of hypothetical facts" and could "refer to the Federal Motor Carrier Safety Regulations and the role they play in developing safety standards in the commercial trucking industry, but he may not testify that rules and regulations were violated." *Id.*

The *Trinidad* court succinctly summarized and relied upon *Lohr*, which was a case involving a collision between the driver of a sedan and the driver of a tractor-trailer truck:

> In *Lohr*, plaintiff proffered a trucking safety and management expert to opine that defendant's conduct fell below the standard of care in the trucking industry. In his opinion, the expert discussed the Federal Motor Carrier Safety Regulations. The defendant moved to exclude the expert's opinion, arguing it amounted to a legal conclusion. The court agreed that the witness could not interpret regulations, but denied the defendant's motion, noting "[t]here is no *per se* bar on expert testimony about regulations in the Eleventh Circuit." *Id.* The court continued, "Alabama law does not recognize a negligence-per-se cause of action based on the Federal Motor Carrier Safety Regulations, but such regulations may be considered by a jury to determine whether a defendant exercised appropriate care for the situation. Furthermore, common sense suggests that trucking industry practices around safety are heavily influenced by the regulations on the industry." *Id.* (internal citations omitted). The court allowed the witness to give opinions as to whether the defendant "failed to exercise the appropriate degree of care consistent with industry customs and practices." *Id.*

*Id.* at *5 (quoting *Lohr*, 2014 WL 2832192, at *3). In *Lohr*, the court concluded that the safety transportation expert "ha[d] the experience to describe how the Federal

Motor Carrier Safety Regulations are understood within the industry. . . ."  2014 WL 2832192, at *4; *see also Waldhart v. 7S Trucking, Inc.*, No. 4:15-CV-101, 2017 WL 10152451, at *2 (D.N.D. Sept. 29, 2017) ("Trucking and safety experts regularly testify regarding the standard of care and duties pertaining to commercial truck drivers.").

These authorities teach that a qualified expert like Mr. Allen may opine on how the FMCSRs are understood within the trucking industry and whether different hypothetical facts would deviate from a specified standard of care under the FMCSRs.  Mr. Allen is an industry expert on trucking standards, and he can testify generally about how these regulations apply to different factual scenarios as a matter of industry custom to motor carriers.  For example, Mr. Allen can opine factually on what he believes constitutes a proper owner-operator agreement.  (Doc. # 57-1 at 13.)   Defendants' disagreement with factual interpretations are for cross-examination.  In this regard, Mr. Allen may refer to relevant safety regulations as this testimony will assist the jury in understanding the standard of care in the trucking industry.  But Mr. Allen cannot testify about questions of law, including whether Mega's owner-operator agreement with Mr. Morgan violated the FMCSR or whether Mr. Morgan was a statutory employee of Mega.  (Doc. # 57-1 at 13); *see Amalu v. Stevens Transp., Inc.*, No. 15-CV-1116-STA, 2018 WL 1911136, at *2 (W. D. Tenn. Apr. 23, 2018) (noting that the defendants did not object to the Magistrate

Judge's finding that Mr. Allen was prohibited from testifying "as to legal conclusions as a matter of law, including contract interpretation, whether Tony Mills was a statutory employee, [and] the legal applicability of the Federal Motor Carrier Safety Regulations").  And he cannot testify that a particular FMCSR applies to Defendants or tell the jury that a Defendant violated an applicable FMCSR or duty through specified actions.  However, the court recognizes that these principles are easier stated than applied, and these guidelines are not comprehensive but are provided as a general framework.

Defendants are cautioned that at trial, the court will not allow its "gatekeeper role under *Daubert* . . . to supplant the adversary system or the role of the jury." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (citations and internal quotation marks omitted).  Mr. Allen is a credentialed expert on trucking industry standards.  Although the law precludes Mr. Allen, or any expert, from opining on questions of law or giving legal conclusions, his otherwise factual assessment based on the standard of care in the trucking industry will be permitted, subject to "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . ."  *Daubert*, 509 U.S. at 596.

### 3. *Industry Standards on Best Practices*

Defendants argue that Mr. Allen should be precluded from testifying about "'industry standards' or 'best practices' that are above and beyond what the law or federal regulations require." (Doc. # 57 at 9.)  Mr. Allen's report cites several publications that he says set forth standards required of commercial vehicle operators, including the Motor Fleet Safety Manual; the National Safety Council's Resource Guide, The Dynamics of Fleet Safety; Commercial Vehicle Preventable Accident Manual; and Bumper to Bumper. (Doc. # 57 at 9 (citing Doc # 57-1 at 9–19).)  Defendants point to Mr. Allen's testimony that these publications contain standards of care that are "'higher than what the law imposes'" and instead are "best practices." (Doc. # 57 at 10 (citing Doc. # 57-2 at 55–56, 52).)  These best practices underpin some of Mr. Allen's opinions, including that Mega did not adhere to industry practices by failing to provide vehicle or safe driving practices training to Mr. Morgan and that Mr. Morgan did not drive defensively. (Doc. # 57 at 11; Doc. # 57-1 at 14–15.)

Plaintiffs do not address this aspect of Defendants' motion, but at the same time Defendants cite no authority for their arguments.  This part of Defendants' motion will be denied.

In *Lohr*, the defendants made a similar argument that the safety expert's opinions on the events leading to the collisions and the driver's negligence

"impose[d] a higher standard . . . than is allowed by Alabama law."  2014 WL 2832192, at *2.  The *Lohr* opinion did not divulge whether the opinions that imposed the higher standard were based on publications like those that Mr. Allen cites; however, the reasoning in *Lohr* equally applies here.  The *Lohr* court rejected the defendants' argument.  It pointed out that, under Alabama law, to prove the driver's negligence, the plaintiff had to show that the driver "failed to exercise reasonable care, 'that is, such care as [a] reasonably prudent person would have exercised under the same or similar circumstances.'"  *Id.* (quoting *Klein v. Mr. Transmission, Inc.*, 318 So. 2d 676, 679 (Ala. 1975)).  The court reasoned, first, that the expert's testimony on how to safely drive a tractor-trailer, which "is a significantly different kind of vehicle from that driven by an ordinary juror," would "be helpful to the jury." *Id.*  Second, the court found that "it is well-established under Alabama law that the customs and practices within an industry may be considered by a jury, but are not determinative, when deciding whether the standard of care has been breached in a given situation."  *Id.* (citing *Klein*, 318 So. 2d at 441–42 & *King v. Nat'l Spa & Pool Inst., Inc.*, 570 So. 2d 612, 616 (Ala. 1990)); *see also King, Inc.*, 570 So. 2d at 616 (Evidence of industry standards, such as "standards promulgated by the trade association in this case," "is not conclusive . . . , but is evidence of due care or lack of due care, to be evaluated by the trier of fact with other evidence on this issue."); *cf. Stiefel*, 2021 WL 426217, at *12 ("[C]ourts routinely permit a qualified expert to

use a state's CDL Manual and/or the FMCSRs as bases for an opinion regarding the applicable standard of care in a trucking accident case."); *Lundquist v. Whitted*, No. 15-CV-148-NDF, 2016 WL 3674695, at *3 (D. Wyo. May 25, 2016) (finding that a trucking safety expert could opine that the defendants violated the CDL manual, "which [was] not the legal standard of care," but which was proper because the opinion went "to the ultimate issue of the case—Defendants' negligence and causation—but d[id] not instruct the jury on the law," but holding that expert was "not permitted to testify Defendants were negligent or actually caused the accident").

The court aligns with *Lohr* and finds that Mr. Allen "is qualified to offer insights to the jury as to the nature of driving a tractor-trailer and the industry practices for driving such a truck safely," 2014 WL 2832192 at *3, even where those industry standards exceed what is required under the law.  In addition, Mr. Allen may opine on whether Defendants "failed to exercise the appropriate degree of care consistent with industry customs and practices."  *Id.*  Defendants can object at trial if Mr. Allen's testimony opinions stray into legal conclusions or in areas lacking relevance, but their *Daubert* motion on this part of Mr. Allen's testimony—namely his reliance on various publications providing standards of care in the trucking industry—will be denied.

**4.** *Failure to Conduct a Post-Accident Investigation*

Defendants move to preclude Mr. Allen's testimony that Mega was negligent in failing to conduct a post-accident investigation, including interviewing Mr. Morgan or testing him for drugs or alcohol.  (Doc. # 67 at 12–13.)  Defendants assert several grounds for excluding this testimony, but one is dispositive:  Mega's "post-accident activities . . . are not causally related to the accident itself."  (Doc. # 57 at 13.)

"Expert testimony that does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Daubert*, 509 U.S. at 591.  In *Trinidad*, the court excluded similar testimony by a safety standards expert on the lack of a post-accident investigation because "it d[id] not appear that [the defendant's] actions after the accident could have contributed in any way to the accident itself."  2016 WL 5239866, at *3.  The court found that the post-accident opinions were not relevant because they did "not make the existence of any fact of consequence . . . more or less probable . . . ."  *Id.*; *see also Knecht v. Balanescu*, No. 4:16-CV-00549, 2017 WL 4883198, at *8 (M.D. Pa. Oct. 30, 2017) (explaining that evidence of regulatory violations that have no bearing on the causation of an accident generally are inadmissible (citations omitted)).

Against this legal backdrop,  Plaintiffs have not shown how any deficiencies in Mega's post-accident investigation are relevant to whether Mega or Mr. Morgan

were negligent in allowing the collision to occur.   Additionally, Plaintiffs have not alleged, argued, or proffered evidence suggesting that Mr. Morgan was under the influence of drugs or alcohol at the time of the noon-day accident; therefore, Mr. Allen's testimony that Mega's failure to test Mr. Morgan for drug use after the accident violated standards in the trucking industry (Doc. # 57-1 at 16) is not helpful. Having left these points unrebutted, Plaintiffs have not shown how Mr. Allen's testimony as to post-accident investigations would be helpful, so the testimony will be excluded.  Specifically, Mr. Allen cannot testify about the opinions beginning on page 15 of his report under the heading, "Accident Investigation," and continuing on page 17 will be excluded.  (Doc. # 57-1 at 15–17.)

**5.** *Mr. Morgan's Driving Skills on the Day of the Collision*

Defendants move to exclude Mr. Allen's opinions that Mr. Morgan "wasn't driving defensively" and "wasn't [driving] as a safe, prudent driver" on the day of the collision.  (Doc. # 57 at 15 (citing Doc. # 57-2 at 119).)  Defendants argue that the opinions are not reliable or helpful (1) because there is no evidence that Mr. Morgan was an incompetent driver on the day of the collision and (2) because Mr. Allen has not "causally relate[d] any action or inaction of Mega to the accident itself."  (Doc. # 57 at 15.)  When Defendants filed their *Daubert* motion to exclude Mr. Allen's testimony, the court had not yet ruled on the summary judgment motion where Defendants made the same arguments.  These arguments were rejected in the

summary judgment opinion, and they are rejected here as well. (Doc # 119 at 15–21 (finding genuine disputes of material fact as to whether Mr. Morgan was a competent driver and whether Defendants knew about his incompetency).) Because the evidentiary foundation underlying Defendants' arguments to exclude Mr. Allen's opinion present disputed issues for the jury to decide, the arguments do not supply grounds for excluding Mr. Allen's opinions as to the manner of Mr. Morgan's driving on the day of the collision.

**6.    *The Cause of the Collision***

Defendants argue that Mr. Allen cannot testify to the cause of the collision because his opinion fails under all three *Daubert* prongs—qualifications, reliability, and helpfulness. They argue that Mr. Allen's opinion that Mr. Morgan "made the left-hand turn when it was not safe and did not yield the right of way" (Doc. # 57 at 16) is inadmissible because it based only on Mr. Allen's "experience as a truck driver and a review of the video" and not on a reliable method and that therefore the opinion also is not helpful. (Doc. # 57 at 18 (citing Allen Dep. at 109–10).) Plaintiffs did not respond to this argument; hence, Defendants point is unrefuted.

The court agrees with Defendants. The opinion in *Deliefde v. Nixon* is instructive. *See* No. 3:19-CV-226-DPJ, 2021 WL 4164680 (S.D. Miss. Sept. 13, 2021). There, passengers suffered injuries in a bus crash and sued the bus driver for negligence. *See id.* at *1. The court precluded Mr. Allen from testifying that the

defendant bus driver "caused the accident" because, "even assuming Allen possessed the expertise to reconstruct an accident, he ha[d] not based his opinion on 'scientific, technical, or other specialized knowledge.'" *Id.* (quoting Fed. R. Evid. 702(a)). Rather, Mr. Allen "merely observe[d] that [the defendant] wrecked the bus because she was intoxicated, driving too fast, and her jacket may have obstructed her view." *Id.* (internal citation omitted). "A lay jury does not need an expert to 'understand [this] evidence' and is equally capable of drawing those conclusions." *Id.* (quoting Fed. R. Evid. 702(a)).

The same holds true here. Plaintiffs have not pointed to any evidence that Mr. Allen performed or reviewed any measurements of the scene, that he employed generally recognized principles for deciding the cause of a trucking accident, or that he conducted a time-distance evaluation. (*See generally* Doc. # 57 at 18–19.) Although Mr. Allen is an expert in the trucking industry, "without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Deliefde*, 2021 WL 4164680, at *14 (citation and internal quotation marks omitted). Mr. Allen's opinion on the cause of the accident is based principally upon his review of the video "numerous times" (Doc. # 57-1 at 15) from which he says Mr. Morgan did not yield the right of way.[8] Plaintiffs have not shown that this

---

[8] Mr. Allen opines: Mr. Morgan's "tractor was equipped with a video camera that faced outward. By reviewing the video, numerous times[,] it is very clear Defendant Morgan made the

opinion is based on "scientific, technical, or other specialized knowledge."  Fed. R.

Evid. 702(a).  A lay jury does not need Mr. Allen's testimony to understand the video

evidence; it is "equally capable" of watching the video and concluding on fault.

*Deliefde*, 2021 WL 4164680, at *14.  Mr. Allen's opinion on "the main cause of the

accident" (Doc. # 57-1 at 15) will be excluded because it is not based on reliable

principles and is not helpful.

**C.   <u>William F. Messerschmidt</u>**

Plaintiffs have identified William F. Messerschmidt as an accident

reconstructionist and safety consultant expert.   Defendants concede that Mr.

Messerschmidt is qualified to render most of his opinions about the crash.  However,

they argue that three of his opinions and the accident simulations he created using

the Virtual CRASH software are based on unreliable methods and will not help the

jury understand the evidence related to the crash.  (Doc. # 62 at 2–5, 7–14; Doc. # 80

at 2.)   Defendants move to exclude the accident simulations and three of Mr.

Messerschmidt's conclusions, which are:

> [6.] The combination of avoidance responses used by Mr. Abbott
> would have successfully avoided a collision if the 2007 Freightliner had
> made a left turn from behind the CR-7723 intersection, rather than in
> front of it.
>
>                                . . .
>
> [11.] Had Mr. Morgan made a typical, legal left turn from behind
> (just North of) CR-7723, and accelerated in an identical manner, and if

---

left-hand turn when it was not safe and did not yield the right of way.  This was the main cause of
this collision."  (Doc. # 57-1 at 15.)

Mr. Abbott responded in the identical manner in which he did, no collision would have occurred.

. . .

[12.] The primary contributing circumstance in this collision was, as determined by the investigating State Trooper, Mr. Morgan's failure to yield. This, coupled with the fact that he did so using an atypical left turn which required a slower speed and longer path contributed to the collision.

(*See* Doc. # 62-1 at 9–10 (alterations added).)

As to conclusion 6, Defendants contend that Mr. Messerschmidt's opinions are unreliable because he admits that he does not know "precisely" at what point Mr. Abbott applied the jake brake or started downshifting. (Doc. # 80 at 3 (citing Doc. # 62-3 at 134–35); *see also* Doc. # 62-1 at 9 ("The point at which Mr. Abbott responded to the path intrusion cannot be precisely determined, since his acts of downshifting and using his jake brake leave no physical evidence.").) According to Defendants, because Mr. Messerschmidt cannot precisely determine the timing of Mr. Abbott's "avoidance responses," his opinion is based on "inaccurate calculations" and is inadmissible. (Doc. # 62 at 8.) In sum, Defendants argue that "[b]ecause Messerschmidt cannot determine when and where Abbott began his alleged avoidance responses of braking, jake braking, downshifting, and slowing down, he cannot opine that they could have prevented the collision." (Doc. # 62 at 9.)

As to conclusion 11, Defendants contend that it is unreliable for the same reasons discussed above, namely that Mr. Messerschmidt "cannot determine when

the avoidance responses occurred." (Doc. # 62 at 10.) Additionally, Defendants argue that Mr. Messerschmidt's opinion that Morgan's turn was atypical is unreliable because Mr. Messerschmidt "cannot establish a conclusive start point" for Mr. Morgan's turn and because he provides no reliable data to explain what a typical turn would be or why Mr. Morgan's "turn was 30 feet longer than a 'typical' turn." (Doc. # 62 at 10–11.)

As to conclusion 12, Defendants argue that Mr. Messerschmidt's opinion that Mr. Morgan was at fault for the crash should be precluded. According to Defendants, his conclusion impermissibly incorporates Trooper Wallace's finding of fault (which Defendants say is inadmissible), and again his opinion that Mr. Morgan's left turn was atypical is not reliable. (Doc. # 62 at 12–13.)

Finally, Defendants contend that Mr. Messerschmidt's simulations of the crash are based on two pieces of unreliable data, first that Mr. Abbott's starting speed was 65 mph (and not 63 mph as Mr. Abbott testified) and second that Mr. Abbott slowed down "almost immediately." (Doc. # 62 at 13.)

Responding, Plaintiffs point out that Mr. Messerschmidt employed physics-backed, reliable methodologies to ascertain that Mr. Abbott began braking at least 130 feet before impact and that the speed of Mr. Abbott's tractor-trailer at impact was 50 mph. (Doc. # 70 at 9–10.) And Plaintiffs contend that Mr. Messerschmidt had multiple sources of information to reach his opinions and create the simulations,

including photos, Mr. Abbott's testimony, the dash cam video, weather data, the size and weight of the trucks, the location of gouge marks, and the placement of the tractor-trailers after impact.  (Doc. # 70 at 10–11.)  Plaintiffs further point to Mr. Messerschmidt's deposition testimony where he defines a typical left turn and where he addresses the methods and data used to determine the time and distance Mr. Morgan needed to complete his turn to avert the collision.  (Doc. # 70 at 14–16.) Plaintiffs also cite Mr. Messerschmidt's testimony about the scientific methods underlying the simulations he created and the data upon which he relied.  (Doc. # 70 at 17–20.)

*Daubert* demands trial courts to "act as 'gatekeepers' to ensure that speculative, unreliable expert testimony does not reach the jury."  *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).  The court has carefully considered the arguments, has read the few cases cited (which are not contextually analogous), and has reviewed Mr. Messerschmidt's report and deposition.  Mr. Messerschmidt's opinions are not speculative, and the methods Mr. Messerschmidt used to reach his opinions and to create the simulations are sufficiently reliable and relevant to be admissible and also will help the jury.

The only caveat at this juncture is that Mr. Messerschmidt cannot rely on Trooper Wallace's opinion as to the cause of the accident but must show he opined on causation independent of Trooper Wallace's opinion.  Otherwise, the sum of

Defendants' arguments points out weaknesses in Mr. Messerschmidt's opinions and data. These matters are ripe for cross-examination, but they do not require the exclusion of the challenged testimony and simulations. Defendants will have ample opportunity to cross-examine Mr. Messerschmidt about the data, methodology, and sources of any assumptions. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Defendants' motion to exclude certain testimony of Mr. Messerschmidt will be denied.

### III.  CONCLUSION

Based on the foregoing, it is ORDERED as follows:

(1)    Defendants' *Daubert* Motion to Exclude Certain Testimony of Michael Wallace (Doc. # 58) on causation and fault is GRANTED.

(2)    Defendants' *Daubert* Motion to Exclude the Expert Testimony of Roger Allen (Doc. # 57) is GRANTED in part and DENIED in part as follows:

(a)    GRANTED to the extent that Mr. Allen is precluded from testifying to legal conclusions.

(b)    GRANTED to the extent that Mr. Allen is precluded from giving legal opinions about the meaning of the Federal Motor Carrier Safety Regulations

(FMCSR) and whether Defendants complied with their obligations under the FMCSR, but otherwise is DENIED.

       (c)    DENIED as to Mr. Allen's testimony on the standards of care in the trucking industry.

       (d)    GRANTED as to Mr. Allen's opinions on post-accident investigations.

       (e)    DENIED as to Mr. Allen's opinions on Mr. Morgan's driving skills on the day of the collision.

       (f)    GRANTED as to Mr. Allen's opinions on the cause of the collision.

    (3)    Defendants' *Daubert* Motion to Exclude Certain Testimony of William F. Messerschmidt (Doc. # 62) is DENIED.

    DONE this 25th day of March, 2023.

               /s/ W. Keith Watkins
               UNITED STATES DISTRICT JUDGE